UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| FRANK BLACK, | ) | Civil Action No.: 4:06-899-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| JOHN E. POTTER, Postmaster General, | ) | |
| and UNITED STATES POSTAL | ) | |
| SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff, proceeding pro se, alleges causes of action for race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, and a state law cause of action for wrongful termination.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 31).  Because Plaintiff is proceeding pro se, he was advised, pursuant to Roseboro v. Garrison, 528 F.3d 309 (4ᵗʰ Cir. 1975), that a failure to respond to Defendant's Motion for Summary Judgment could result in dismissal of her Complaint.  Plaintiff timely filed his Response (Document # 34) on July 23, 2007.   All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

Plaintiff began working with Defendant in 1978 in California.  Plaintiff Dep. at 14.  He

transferred to Columbia, South Carolina in 1990 in the position of city letter carrier. Id. at 17. On February 8, 2000, he became a supervisor, EAS 17, at the Myrtle Beach post office. Id. at 21. From June of 2002 through January of 2004, Plaintiff held the position of Supervisor of Customer Services. Id. at 52. Bruce Fowler became Officer in Charge (OIC) and Plaintiff's supervisor in 2004. Id. at 28; Fowler Declaration at ¶ 1.

As Customer Service Supervisor, Plaintiff supervised a number of city carriers, including Jeffery Jensen and Theodore Thasitis. Plaintiff Dep. at 52. Carriers, as well as other craft employees, swipe their time badges to establish their beginning and ending tour of duty times as well as their lunch breaks. Plaintiff Dep. at 60-61; Fowler Declaration at ¶ 4. On certain occasions, management employees are allowed to adjust time for their supervised employees in the Time and Attendance System (TACS). Fowler Declaration at ¶ 4. However, management employees are not allowed to adjust time so that supervised employees are compensated for hours not worked. Id. Also, management employees are not required to swipe time badges to begin and end their own tours of duty as their regularly scheduled time is automatically entered into TACS. Id.

In early January of 2004, the United States Postal Inspection Service was contacted by the Postmaster of the North Myrtle Beach Post Office regarding allegations of employee misconduct by Plaintiff that he entered fraudulent clock rings for carriers Jensen and Thasitis. Key Declaration at ¶ 1. The specific allegations against Plaintiff were that, every Saturday for over a year, Plaintiff allowed carriers Jensen and Thasitis to leave work before their scheduled end tour and told them not to swipe their time badges to end their tour because he would "take care of their time" on the following Monday. Id. On Mondays, Plaintiff entered TACS and entered end tours for Jensen and Thasitis ranging between 4:00 and 4:30 p.m. Id.

Postal Inspector Ralph Key began an investigation into the allegations of misconduct, which

included interviews with several employees at the Myrtle Beach Main Post Office in Myrtle Beach, and an analysis of TACS reports, AVUS vehicle utilization reports, and workload status reports. Id. at 3.

On January 15, 2004, Inspector Key attempted to interview Plaintiff regarding the investigation. Id. at 4. When he told Plaintiff he needed to interview him, Plaintiff said "I have an operation to run" and walked away. Id. Inspector Key repeatedly told Plaintiff he needed to interview him, but Plaintiff responded in an "elevated tone" that Key was harassing him and that he had an operation to run. Id. Key then asked Guerry Reynolds, another supervisor, to take over for Plaintiff while he interviewed him. Id. Key also asked Plaintiff if he understood the meaning of failure to cooperate in a postal investigation. Id. Plaintiff again told Key that he was harassing him. Id. Key went to the interview room and waited for Plaintiff for approximately fifteen minutes. Id. Key then returned to the work floor and again told Plaintiff that he needed to interview him and that he needed him to pull records on Jensen and Thasitis. Id. At some point, OIC Fowler was called and told that Plaintiff was not cooperating with the Postal Investigation. Fowler Declaration at ¶ 2. Plaintiff eventually allowed Key to interview him. Key Declaration at ¶ 4. In the Memorandum of Interview, attached to Inspector Key's Declaration and dated January 16, 2004, Inspector Key notes that "[p]rior to the interview, [Plaintiff] was informed that he was not under arrest and he did not have to answer questions if he did not wish. [Plaintiff] agreed to be interviewed." Key Declaration at Ex. A.

Plaintiff disputes that he failed to cooperate. He asserts that on the morning the inspectors came to interview him,

> Inspector Key came up to me and asked if I was ready to do the interview. I said yes, but give me a few minutes to split some routes. As I said those words I turned and started to walk toward my work area in the back. Inspector Key said no I need to speak to you now. I turned and said that I only needed a few minutes as I was walking toward Inspector Key. Again, Inspector Key said, I need to speak to you now. I tried

to explain to Inspector Key that I had three routes down and if I am not allow [sic] to make the daily assignments some mail would not be delivered.  I told him I was not going to run away and that he could accompany me to my work area.  Inspector Key said to Supervisor Reynolds.  Tell [sic] him the penalty for refusing to cooperate during a postal investigation.  Mr. Reynolds said he did not know the penalty.  I said to Inspector Key I am not refusing to cooperate.  Inspector Key turned and went into the interview room.  Inspector Key said something [sic] Inspector Baker and returned immediately to Supervisor Reynolds' desk where I was still standing. . . . I asked Inspector Key was he there to harass me.  He said he was not harassing me.  I realized that Inspector Key was not going to allow me to split the routes.  I told Inspector Key let's go.  The interview began at 8:07 (see Defendant Exhibit 3, Memorandum of Interview, Frank Black).  The whole incident took less than seven minutes.

Plaintiff Declaration at ¶ 16.

During the interview, Plaintiff did not deny that he had adjusted the end tour times for Thasitis

and Jensen. Key Declaration at ¶ 5.  The Memorandum of Interview provides, inter alia, that

Inspector Key informed [Plaintiff] that TACS information revealed he consistently ended the tour of two of his carriers for over 1 year.  [Plaintiff] said he had possibly done some, but could not remember.  [Plaintiff] then said he would give the carriers the time because they worked hard.  When asked why he only compensated two carriers instead of all carriers in his functional area, he said no other carrier worked as hard as Jensen and Thasitis.

According to [Plaintiff], he had every right to grant his carriers 8 hours if they were done early.  He said he based giving early time on the fact that the carriers are guaranteed 8 hours according to the contract.  He said even though he would allow them to leave, he would require a 3971 [leave slip] for early time.  Inspector Key informed [Plaintiff] that there were no 3971's on file for the time period in question, he offered no response.

[Plaintiff] was then informed that during an interview with the carriers, they each said he instructed them not to clock out, and that their time would be entered.  [Plaintiff] was asked to explain.  According to [Plaintiff] he never told the carriers not to clock out.  Inspectors asked the question a second time.  This time he said he did tell the carriers to leave; he further said he would take full responsibility.

Key Declaration at Ex. A.

Inspector Key interviewed T-6 Letter Carrier and Acting Supervisor Jason Wisor, who stated

that Jensen and Thasitis consistently left prior to their scheduled end tour on Saturdays and it angered

-4-

him that they got to leave early and still get paid for a full day's work while he was working extra hard. Investigative Memorandum at ¶ 7 (attached as Ex. B to Key Declaration). Inspector Key also interviewed Distribution Clerk Honey Vanderhyd. Id. at ¶ 8. Vanderhyd is the clearing clerk responsible for ensuring that each of the carriers are back from the route and their accountable items, including their vehicle keys, are secured. Id. Vanderhyd stated that she works every Saturday and closes the facility at approximately 6:30 p.m. Id. at ¶ 9. She stated that she received keys early in the afternoon from Jensen's route. Id. She further stated that Jensen is gone each Saturday no later than 3:00 or 3:30 p.m. Id.

A review of Jensen's TACS records revealed that Plaintiff input shift end times for Mr. Jensen virtually every Saturday for the previous two years. Id. at ¶ 11. Each of the 11 other carriers scheduled to work on Saturdays ended their own shifts using the electronic time clock. Id. at ¶ 12. Jensen was interviewed on January 14, 2004. Id. at ¶ 15. He indicated that he leaves early every Saturday and that he was told by his supervisor not to clock out on Saturday and that he would take care of the time. Id. at ¶¶ 16-17.

Inspector Key reported in his Investigative Memorandum that Plaintiff's actions in allowing Jensen to leave early resulted in Jensen being paid for approximately 70 hours from July 2002 through January 2004 that Jensen did not work resulting in a loss to the USPS of $1,722.00. Id. at ¶¶ 13-14. Apparently, Inspector Key also determined that Thasitis was paid for approximately 102 hours he did not work between June 2002 and January 2004, resulting in a loss to USPS of $2,467.00.

After reviewing the Investigative Memorandum from Inspector Key, OIC Fowler conducted an additional investigation by interviewing Jensen and Thasitis and Plaintiff. Fowler Declaration at ¶ 5. Fowler learned from Thasitis and Jensen that they swiped their time badges to end their tours of duty Monday through Friday, but, at the direction of Plaintiff, did not swipe their time badges to end

their tours on Saturdays.  Id. at ¶ 5.  Thasitis stated that either Plaintiff or the "204B," Jason Wisor, would instruct him not to use his badge on Saturdays.  Id. at Ex. A.

OIC Fowler determined that removal was the appropriate discipline for Plaintiff's actions.  Id. at ¶ 7.  On March 15, 2004, OIC Fowler prepared a Disciplinary Action Request.  Id. at ¶ 7 and Ex. B.

On April 7, 2004, OIC Fowler issued a Notice of Proposed Removal to Plaintiff with charges of unacceptable conduct in falsifying employee clock rings, in violation of Sections 661.53 and 666.84 of the Employee and Labor Relations Manual, and failure to cooperate in a postal investigation, in violation of Section 666.6 of the Employee and Labor Relations Manual.  Id. at ¶ 8 and Ex. C.

With regard to his actions with the employee clock rings, Plaintiff cites to the "7:01 Rule," which states "A City Letter Carrier who actually works more than 7 hours, but less than 8 hours of a regular scheduled day and who is officially excused from the completion of the 8 hour tour is credited with 8 hours or work time for pay purposes.  This is known as the 7:01 rule. (See 444.211(g).[1])" Employee and Labor Relations Manual Section 432.53 (attached as Ex. A to Plaintiff's Response). Plaintiff avers,

> I stopped the usage of the 7:01 Rule as it was being used at the Main Office. . . . I told the carriers that they could still use the 7:01 Rule.  However, they must perform other duties such as casing and/or carrying mail on other routes in addition to their own duties.  I would keep up with their time so they would be correctly paid.  The carriers were usually given one, or two, or three hours of addition work depending on their under time.  Some of the carriers tried to use the new 7:01 Rule, but it placed an unusual burden on them.  So, very few carriers used the 7:01 Rule.  The carriers that used the modified 7:01 Rule were allowed to leave early.  I would take care of their time to ensure that they were paid correctly.  Also, my replacement, acting Supervisor Jason Wisor would allow the carriers that worked under modified Rule 7:01 Rule to leave early and Mr. Wisor took care of their time to ensure that the carriers were correctly paid.

---

[1]A copy of section 444.211(g) is not in the record.

Plaintiff Declaration at ¶¶ 5-6.

In his declaration, Fowler states, "I am familiar with the '7:01 Rule' which management could invoke to allow a supervised employee who had worked seven hours and one minute to be paid for eight hours of work provided that the employee complete a Form 3971 to reflect that Rule 7:01 had been invoked. At the Myrtle Beach Post Office, however, I understood that the prior postmaster sent out a Memorandum providing that management was not allowed to invoke the '7:01 Rule.'" Fowler Declaration at ¶ 6.

Plaintiff first made contact with the USPS Agency EEO office on April 21, 2004[2], alleging race discrimination, based on the Notice of Proposed Removal. Administrative Record (A.R.) at 121-22; 377-80. Plaintiff indicated that the proposed removal was based on an investigation of him and two other employees concerning time and attendance, but the other two employees, both of whom are white, were not charged or disciplined. A.R. at 121; 377. Plaintiff listed Thasitis, Wisor, and Reynolds as "Comparisons." A.R. at 122; 378. On May 25, 2004, Plaintiff requested to add age as a basis for discrimination and, as an act of discrimination, the refusal of his right to return to work on May 22, 2004, following annual leave. A.R. at 120; 387-88. Plaintiff elected to participate in the 650 Mediation Process, which was held on June 2, 2004, but no resolution was reached. A.R. at 109-14; 116-18; 124; 375; 381-84; 389.

On June 16, 2004, Senior Post Office Operations Manager, Stephen Niedziela, issued a Letter

---

[2]The form, entitled "Information for Pre-Complaint Counseling," has "Date Mailed" listed as April 21, 2004. It is stamped "Received" by EEO Dispute Resolution on May 20, 2004. Apparently, after Plaintiff made some sort of informal contact with Defendant's EEO Office on April 21, 2004, the Office sent Plaintiff a form to complete and return, and Plaintiff returned the completed form on May 20, 2004.

of Decision for Notice of Proposed Removal upholding the Agency's decision to remove Plaintiff from the Postal Service. A.R. at 9. Niedziela noted in the letter that Plaintiff had admitted his wrongdoing to him, the Postal Inspectors and the acting Postmaster. A.R. at 9. He found that Plaintiff's actions "have resulted in compromising [Plaintiff's] reliability and trustworthiness." A.R. at 10. Niedziela made Plaintiff's removal effective June 25, 2004. A.R. at 10.

On June 25, 2004, Plaintiff was provided with a Notice of Right to File Mixed Complaint, and he filed a formal EEO Complaint of Discrimination on June 30, 2004. A.R. at 105-07; 396-98. In the formal complaint, Plaintiff alleges discrimination, in the form of his removal, based on age and race. A.R. at 105-07; 396-98.

On July 23, 2004, the USPS EEO issued an Acceptance of Complaint-Mixed Case, stating, inter alia:

> The scope of the investigation will include the following issue(s) only:
>
> Specific Issue(s): The complainant alleged discrimination when he was subjected to disparate treatment based on race (African-American (Black)), and age (DOB: [redacted])) when: on April 19, 2004, he received a Notice of Proposed Removal which subsequently resulted in a Letter of Decision for Notice of Proposed Removal effective June 25, 2004.

A.R. at 405. The document further provided, "If you do not agree with the defined accepted issue(s), you must provide a written response specifying the nature of your disagreement within seven (7) calendar days of receipt of this letter." A.R. at 406.

The EEO Investigation was completed on November 11, 2004, and a copy of the investigative file was mailed to Plaintiff on November 18, 2004. A.R. at 409-411. The agency issued a Final Agency Decision on November 29, 2004, finding that 1) Plaintiff failed to establish a prima facie case of discrimination, 2) the employer articulated non-discriminatory reasons for its actions through its findings of unacceptable conduct in the falsification of recording time and in failure to cooperate with

-8-

a postal inspection and 3) Plaintiff did not meet the burden of establishing that the employer's articulated reasons were a pretext to mask prohibited discrimination.  A.R. at 131-36; 412-18.

The Final Agency Decision notified Plaintiff that he had the option of either appealing to the Merit Systems Protection Board (MSPB) or filing a civil action in an appropriate district court.  A.R. at 416.  Plaintiff filed an appeal with the MSPB on December 14, 2004.  A.R. at 2-5.  The administrative law judge issued an Initial Decision on June 28, 2005, affirming the agency's action.  A.R. at 325-33.  On November 4, 2005, the MSPB denied Plaintiff's petition for review and found the decision of the administrative law judge as final.  A.R. at 369-70.

On December 20, 2005, Plaintiff filed a Petition for Review with the Equal Employment Opportunity Commission (EEOC).  A.R. at 420-31.  On February 14, 2006, the EEOC issued an opinion finding that the MSPB's decision finding no discrimination constitutes a correct interpretation of the laws, rules, regulations and policies governing the matter and the decision was supported by the evidence in the record as a whole.  A.R. at 432-33.

Plaintiff filed the present action on March 23, 2006, alleging employment discrimination based upon race, wrongful termination, and retaliation.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine issue for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v.

-10-

Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**IV.    DISCUSSION**

    A.    Race Discrimination

    In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),[3] the Supreme Court set forth

a burden-shifting scheme for analyzing discrimination cases.  Under McDonnell Douglas, plaintiff

has the initial burden of demonstrating a prima facie case of discrimination.  To establish a prima

facie case, plaintiff must show (1) he is a member of a protected class; (2) he was qualified for his

job and his job performance was satisfactory; (3) he suffered an adverse employment action; and (4)

other employees who are not members of the protected class were retained under apparently similar

circumstances.  Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002).[4]  Under

some circumstances, the fourth element can be established by presenting evidence raising an

inference of discrimination.  See Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir. 2005); EEOC v.

Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)(citing Texas Dept. of Community

Affairs v. Burdine, 450 U.S. 248 (1981)).  Once plaintiff has established a prima facie case, the

burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981).  This is merely a burden

of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

_____

    [3]  The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509
U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097,
147 L.Ed.2d 105 (2000).

    [4]To the extent Plaintiff is asserting a claim pursuant to 42 U.S.C. § 1981, the required
elements of a prima facie case are the same under Title VII and § 1981.  Gairola v. Commonwealth
of Va. Dep't. Of Gen. Services, 753 F.2d 1281, 1285 (4th Cir. 1985).

Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination. Reeves, 530 U.S. at 143. During all of the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him based on his race.

In the present case, Plaintiff easily meets the first and third elements of a prima facie case of discrimination. As a black male, he is a member of a protected class, and he suffered an adverse employment action when he was terminated from employment. In addition, Defendant concedes that Plaintiff was qualified for his job. See Memorandum in Support of Defendant's Motion at 13. However, Defendant argues that Plaintiff does not meet his burden of establishing a prima facie case because he cannot show that his job performance was satisfactory or that similarly situated employees were treated differently.

According to Defendant, Plaintiff's job performance was not satisfactory because he allowed Jensen and Thasitis to leave early on Saturdays and would enter their end time in TACS to insure that they were compensated for eight hours even though they had not worked eight hours. Plaintiff avers that he used a modified version of the 7.01 Rule and allowed Jensen and Thasitis to leave early on Saturdays because they completed extra work in addition to their own duties and no other carriers were

-12-

able to do so.  Plaintiff also avers that he discontinued use of the 7.01 Rule as it is described in Section 432.53 of the Employee and Labor Relations Manual.  Fowler responded by stating that he was familiar with the 7.01 Rule and that it required the employee to complete a Form 3971 to reflect that Rule 7:01 had been invoked.[5]  According to Inspector Key, a review of the files revealed that there were no 3971s on record for the time period in question.  Furthermore, Fowler averred that he understood that the prior postmaster at the Myrtle Beach Post Office sent out a Memorandum providing that management was not allowed to invoke the '7:01 Rule.'

Because the reason Defendant asserts that Plaintiff's job performance was unsatisfactory is the same reason Plaintiff was discharged, and there is no evidence in the record that Plaintiff's job performance was otherwise unsatisfactory, the undersigned will assume for purposes of determining whether Plaintiff has established a prima facie case only that Plaintiff's job performance was satisfactory except for his use of the "modified" 7.01 Rule.

Defendant also argues that there were no similarly situated employees that were treated differently under the same circumstances.  Plaintiff names several employees he claims were similarly situated: Bruce Fowler, Jason Wisor, Gerry Reynolds, George Fagan, Matt Atkinson, and various other, unnamed employees.  All of these employees are white.

Plaintiff must establish that "other employees" were similarly situated in all relevant respects; that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toledo Hosp., 964 F2d 577, 583 (6th Cir.

---

[5]There is no mention in Section 432.53 of the Employee and Labor Relations Manual that a Form 3971 is required for the 7.01 Rule.  However, it should be noted that section 432.53 makes reference to section 444.211(g), which has not been included in the record.

1992)(citing <u>Mazzella v. RCA Global Communications, Inc.</u>, 642 F.Supp. 1531 (S.D.N.Y.1986),

aff'd, 814 F.2d 653 (2d Cir.1987); <u>Lanear v. Safeway Grocery</u>, 843 F.2d 298 (8th Cir.1988) (plaintiff

must prove that he and the white employee were similarly situated in all respects and that the other

employee's acts were of comparable seriousness to his own); <u>Cox v. Electronic Data Systems Corp.</u>,

751 F.Supp. 680 (E.D.Mich.1990)); <u>Radue v. Kimberly-Clark Corp.</u>, 219 F3d 612,617-18 (7th Cir.

2000)(holding that plaintiff must demonstrate that the same supervisor was involved in comparable

situations to demonstrate disparate treatment of similarly situated employees); <u>Stanback v. Best</u>

<u>Diversified Products, Inc.</u>, 180 F.3d 903,910 (8th Cir. 1999)(same); <u>Shumway v. United Parcel Serv.</u>,

<u>Inc.</u>, 188 F.3d 60,64(2d Cir. 1997)(employees were not similarly situated because they were not

supervised by the same person).[6]

      None of the employees named by Plaintiff are similarly situated in all relevant respects.

There is no evidence or even speculation that any of the "comparators" engaged in conduct

considered as failure to cooperate in a postal investigation.  As stated below, the "comparators" are

dissimilar for other reasons, as well.

      Bruce Fowler has been the Officer In Charge (OIC) at the Myrtle Beach Main Post Office

since January of 2004, and was Plaintiff's supervisor.  Thus, he did not hold the same position as

Plaintiff nor was he supervised by the same person.  Furthermore, Plaintiff claims that Fowler

engaged in the same behavior he did by calling Jeffery Jensen in on his day off to be interviewed

about this particular matter.  According to Plaintiff, Fowler's actions resulted in Jensen being paid

---

    [6] There is no published Fourth Circuit case on point; however, the Fourth Circuit has cited
with approval the precedent in this string cite in the unpublished cases of <u>Flateau v. South Carolina
Commission for the Blind</u>, 2002 WL 31553805 (4th Cir. 2002); <u>Heyward v. Monroe</u>, 1998 WL
841494 (4th Cir. 1998); <u>Edwards v. Newport News Shipbuilding and Dry Dock Co.</u>, 1998 WL
841567 (4th Cir. 1998).

for time not worked.  As support, Plaintiff presents a grievance form filed by Jensen indicating he was called into work on his day off, resulting in Jensen being paid 8 hours at one and one-half times pay.  *See* Ex. K to Plaintiff's Response.  No other surrounding facts are established in the record. Plaintiff also asserts that Fowler input time for Supervisor Kim Hanscel in violation of Section 434.144 of the Employee and Labor Relations Manual.  Plaintiff appears to argue that Fowler adjusted Hanscel's time to pay her for time spent on nonwork-related duties.   Most of the evidentiary support Plaintiff relies on includes his own hearsay statements and, thus, Plaintiff fails his burden under Rule 56.   Nonetheless, it is clear that these assertions involve facts and circumstances dissimilar to those involving Mr. Black.  Jensen's circumstances involve a single episode, a grievance filed, and pay for his day off.  Hanscel's circumstances involve time not performing official duties.  Thus, Fowler is not similarly situated to Plaintiff.

Plaintiff also names Gerry Reynolds as a similarly situated employee.  Mr. Reynolds was a clerk supervisor.  It is not clear from the record who supervised Mr. Reynolds.  Plaintiff claims that Mr. Reynolds was regularly paid for time he did not actually work by manually entering his overtime rather than punching the clock.  Plaintiff's allegations amount to nothing more than speculation that Reynolds was paid for time he did not actually work.  Although Plaintiff offers a letter to Inspector Key from Kim Hanscel regarding Reynolds' time as support for his allegations, Hanscel's letter also amounts to little more than speculation.  See Ex. I to Plaintiff's Response.  As Plaintiff notes, in its Answers to Interrogatories, Defendant notes that Inspector Key's investigation found no evidence of misconduct.  Ex. Q to Plaintiff's Response.  Thus, Reynolds is not similarly situated to Plaintiff because they found  no evidence of misconduct and assuming misconduct for the sake of argument, the conduct is dissimilar to that involving Plaintiff because it involved keeping one's own time.

-15-

Additionally, it is not clear who supervised Reynolds.

Plaintiff also asserts that George Fagan, a manager, manipulated his own clock rings so that he was paid for time not worked. On its face, of course, this conduct is dissimilar because it involves keeping one's own time. Fagan was disciplined and demoted to a craft position as a clerk but was not discharged. The record does not reveal the precise position held by Fagan or who supervised him. For all of these reasons, Fagan cannot be considered a similarly situated employee.

Plaintiff also claims that Matt Atkinson is a similarly situated employee. Plaintiff asserts that Atkinson was a Supervisor who settled a grievance with the union by agreeing to stop falsifying postal service form 3996. Plaintiff submits a grievance form in support of his allegations. Ex. J to Plaintiff's Response. The grievance form does not support Plaintiff's allegation that Atkinson was falsifying the forms. It shows only that Atkinson was filling out the 3996 forms when a carrier failed to complete one. Neither Plaintiffs allegations nor the grievance form provide sufficient information from which one could conclude that Atkinson engaged in behavior similar to that for which Plaintiff was discharged. Therefore, he cannot be a similarly situated employee.

Plaintiff contends that several, unnamed supervisors allowed carriers to leave early and entered end times for the carriers. He submits defendant's response to an interrogatory for support. *See* Ex. Q (interrogatory 9). The response indicates other supervisors input time for their employees. However, there is no indication that it was to pay employees for time not worked or otherwise under similar circumstances. Clearly, Plaintiff fails to make an adequate showing that these unnamed supervisors were similarly situated.

Out of the numerous employees Plaintiff identifies as similarly situated, only one, Jason Wisor, can arguably be considered similarly situated. Jason Wisor was a T-6 letter carrier and was

-16-

an "acting supervisor" whenever Plaintiff was out. Wisor was supervised by Plaintiff and would fill

in for Plaintiff when he was out. According to Fowler, his investigation revealed that when Wisor

would fill in for Plaintiff on Mondays, he would, at Plaintiff's direction, "enter end times for

Saturdays TACS resulting in eight hours pay for carriers Thasitis and Jensen." Fowler Declaration

at ¶ 11. In fact, Wisor stated that it angered him that Thasitis and Jensen got to leave early but still

got paid for a full day's work.

Plaintiff claims that Wisor filled in for him on Saturdays, not Mondays,[7] and that Wisor also

allowed Thasitis and Jensen to leave early on Saturdays. In his brief, Plaintiff states the following:

> My nonscheduled day (day-off) was Saturday, not Monday. An adequate
> investigation done by Mr. Fowler or the postal inspectors would have
> revealed this. When I did take a day off, it was Saturday. Mr. Wisor would
> take my place. Mr. Wisor allowed the carriers to leave early. (Plaintiff's
> Exhibit 2, line 5) On Monday, when I returned to work, I usually instruct Mr.
> Wisor to 'fix' the carriers' time because I was not a work on Saturday and did
> not know what transpired. Mr. Wisor entered the end tour for the carriers
> because he allowed them to leave early.

Plaintiff's Response at p. 13 (verbatim).

He further claims that he did not tell Wisor to enter end times for Thasitis or Jensen. Plaintiff Dep.

at 56, 66. This is in conflict with the information provided by Wisor who stated that Plaintiff

instructed him to allow Thasitis and Jensen to leave early and input their time to reflect eight hours.

However, as Plaintiff stated, "anything that happened within my pay location is and was my

responsibility." Investigative Memorandum (attached as Ex. A to Key Declaration). Thus, although

there is an issue of fact as to whether or not Plaintiff instructed Wisor to engage in the same conduct,

Wisor was not similarly situated to Plaintiff in all relevant respects. He held a position lower than

that of Plaintiff and was actually supervised by Plaintiff. His primary position was a letter carrier

---

[7] Exhibit 2 to Plaintiff's Response appears to corroborate this.

and he occupied the acting supervisor position when Plaintiff was out. These factors render him dissimilar in relevant respects. *See Miller v. Automobile Club of New Mexico, Inc.*, 420 F.3d 1098, 1115 (10th Cir. 2005)(although performing some of same duties, not similarly situated); *Cf. Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997)(part-time employee not similarly situated to full-time employee). Additionally, Wisor was not under investigation or subject to disciplinary proceedings. Furthermore, Wisor was not "uncooperative" during an investigation. Plaintiff fails to show that Wisor was subject to the same standards and otherwise similarly situated in all relevant respects.

Because Plaintiff fails to present sufficient evidence to establish that other employees who are not members of the protected class were retained under apparently similar circumstances, Plaintiff fails to establish a prima facie case of discrimination.

However, even assuming Plaintiff has established a prima facie case, Defendant has produced evidence that Plaintiff falsified clock rings for two employees, thereby allowing them to be paid for time they did not actually work, and that Plaintiff failed to cooperate in a postal investigation. Thus, Defendant meets its relatively easy burden of producing a legitimate, nondiscriminatory reason for Plaintiff's discharge, and the presumption of discrimination raised by Plaintiff falls away. See St. Mary's Honor Center, 509 U.S. at 507-08. The burden shifts back to Plaintiff to establish that Defendant's reasons for terminating Plaintiff were not its true reasons, but were pretext for a discriminatory reason.

It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately,

-18-

so long as it truly was the reason for the plaintiff's termination."[8] <u>Hawkins v. Pepsico</u>, 203 F.3d 274,

279 (4thCir. 2000)(quoting and citing <u>DeJarnette v. Corning, Inc.</u>, 133 F.3d 293, 299(4th Cir. 1998);

<u>DeJarnette</u>, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department

weighing the prudence of employment decisions made by firms charged with employment

discrimination ...." (internal quotation marks omitted)); <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270,

277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and

autonomy to make business decisions, including workplace reorganization, as long as the employer

does not violate the ADEA."); <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th

Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the

employer"). It is the perception of the employer that is critical. <u>Hawkins</u>, 203 F.3d at 280. Even

a reasoned decision based on incorrect facts is not evidence of pretext. <u>Pollard v. Rea Magnet Wire</u>

<u>Co.</u>, 824 F.3d 557, 559 (7th Cir. 1987), <u>cert</u>. <u>denied</u>, 484 U.S. 977 (1987).

　　　　Plaintiff has not produced evidence sufficient to create a question of fact as to whether

Defendant's true reasons for discharging Plaintiff were based on intentional race discrimination.

Plaintiff argues extensively that his conduct was not in violation of any rule or regulation and that

other supervisors engaged in the same conduct on a regular basis. However, as noted above, it is not

enough to establish that Defendant's reasons are unpersuasive or unfair. Plaintiff must show that

his alleged reason, race discrimination, is the actual reason for his termination. Although a

reasonable juror could find the decision to terminate the employment of this long time postal

---

[8] "Proof that the employer's proffered reasons are unpersuasive, or even obviously
contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination)
. . . is correct." <u>Reeves</u>, 530 U.S. at 146-47. "It is not enough to disbelieve the [employer]."
<u>Love-Lane v. Martin</u>, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury
could "believe [her] explanation of intentional race discrimination." <u>Id</u>.

employee under these circumstances was unfair, Plaintiff fails to present evidence from which a reasonable juror could conclude the decision was motivated by race discrimination.  As noted above, a reasoned decision that is unfair, unwise or even based on incorrect facts is not alone evidence of pretext.

Plaintiff has presented insufficient evidence that the decision of Inspector Key, who conducted the Investigation, Officer in Charge Bruce Fowler, who issued the Notice of Proposed Removal, or Senior Post Office Operations Manager, Stephen Niedziela, who issued the Letter of Decision for Notice of Proposed Removal upholding the Agency's decision to remove Plaintiff from the Postal Service, was motivated by race discrimination.  As such, Plaintiff fails to meet his burden of establishing discrimination *vel non*, and summary judgment is appropriate on his claim of racial discrimination.

B.      Retaliation

Plaintiff asserts that Defendant retaliated against him for filing with Defendant's EEO coordinator  a form entitled "Information for Pre-Complaint Counseling"(Pre- Complaint Form). Fowler's proposal for removal letter was issued April 7, 2004.  In that letter it indicates that he proposed removal would be "effective no sooner that thirty (30) calendar days from your receipt of this letter."  Exh. C to Plaintiff's Response.   Plaintiff submits a copy of ELM Section 651.76 (Exh. F to Plaintiff's Response) which states, "[t]he employee unless otherwise provided in 651.77, remains in pay status, either on the job or on administrative leave, at the option of the employer, during the notice period.  The notice period must be at least 30 calendar days . . . . *Id.*  Plaintiff subsequently requested and Fowler approved annual leave beginning May 17, 2004 and ending May 22, 2004.  Plaintiff submitted the Pre-Complaint Form on May 20, 2004.  According to Plaintiff, he was changed from

-20-

pay status to non-pay status on May 21, 2004.  The Letter of Decision from Mr. Niedziela is dated June 16, 2004.  Exh. D. to Exh. 2 of Defendant's Motion.  Mr. Niedziela's Letter of Decision indicates an effective removal date of June 25, 2004.  *Id.* at p.2.  The Letter of Decision also implies that he would remain in a pay status until the effective date of removal.  *Id.*

Defendant argues that Plaintiff has failed to exhaust his administrative remedies with regard to his retaliation claim.  Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC.  See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).  The EEOC charge defines the scope of the plaintiff's right to institute a civil suit.  Id.  "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).

The scope of a private action is defined by the scope of the administrative charge from which it arises and from any findings that arise out of the investigation of the charge.  EEOC v. General Elec. Co., 532 F.2d 359, 365 (4th Cir. 1976).  Therefore, only those claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent  lawsuit.  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996) (sexual harassment and discriminatory pay and benefits claims dismissed because EEOC complaint alleged only a failure to promote); Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995) (hiring, promotion, and training discrimination claims dismissed where EEOC charge alleged only discriminatory discipline).

However, with respect to retaliation claims, the Fourth Circuit has held that a plaintiff may

-21-

raise a retaliation claim for the first time in federal court. Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992). The court found that such a rule is "the inevitable corollary of our generally accepted principle that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission." Id. (citing Hill v. Western Electric Co., 672 F.2d 381, 390 n. 6 (4th Cir.) (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir.1970)), cert. denied, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); see also EEOC v. General Electric Co., 532 F.2d 359, 373 (4th Cir.1976)) (internal quotation marks omitted). Also, the court agreed with the Seventh Circuit's rationale that

> having once been retaliated against for filing an administrative charge, the plaintiff will naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation.... [W]e [therefore] join the other circuits that have spoken to the question in adopting the rule that a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge.

Id. (citing Malhotra v. Cotter & Co., 885 F.2d 1305, 1312 (7th Cir.1989); Brown v. Hartshorne Public School District No. 1, 864 F.2d 680, 682 (10th Cir.1988); Kirkland v. Buffalo Bd. of Educ., 622 F.2d 1066, 1068 (2d Cir.1980); Wentz v. Maryland Casualty Co., 869 F.2d 1153, 1154-55 (8th Cir.1989; Gottlieb v. Tulane Univ. of Louisiana, 809 F.2d 278, 284 (5th Cir.1987)).

The rationales set forth in Nealon, are not applicable in the present case. First, the document filed by Plaintiff on May 20, 2004, was not a formal complaint. It was a Pre-Complaint Counseling Form. Furthermore, Plaintiff sent a fax to the EEO Office on May 25, 2004, seeking to add age to the section of the Pre-Complaint Counseling Form entitled "Discrimination Factors" and to add the refusal to allow him to return to work to the section of the form entitled "Description of Incident/Action." Plaintiff did not choose to add retaliation under "Discrimination Factors" even

though it is listed as an option.  Yet, his willingness to add the refusal to allow him to return to work to the other section indicates that he was not "gun shy" about the potential for inviting further retaliation.

The Letter of Decision regarding the proposed discharge was not issued until June 16, 2004, and his removal was not effective until June 25, 2004.  Plaintiff's formal EEO Complaint was filed June 30, 2004.  In that Complaint, he alleges age and race discrimination.  He makes no mention of retaliation even though the alleged retaliatory conduct occurred prior to the filing of the Complaint. Importantly, on July 23, 2004, the EEO issued a letter to Plaintiff accepting his Complaint and defining the scope of the investigation to include only disparate treatment based on race and age. The document further provided, "If you do not agree with the defined <u>accepted</u> issue(s), you must provide a written response specifying the nature of your disagreement within seven (7) calendar days of receipt of this letter."  A.R. at 406.  There is no evidence in the record that Plaintiff objected to the accepted issues as defined by the EEOC.

As set forth in more detail above, Plaintiff's administrative process regarding his claims went through numerous channels before he initiated the present action in this Court.  He included allegations regarding defendant's failure to allow him to return to work in the Pre-Complaint form but does not allege it as retaliation.  Significantly, he did not file his formal Charge of Discrimination until June 30, 2004.  He had the opportunity to include retaliation as a claim at that time.  He was afforded another opportunity on July 23, 2004, when the issues were defined by the EEO.  As set forth in the language cited in *Nealon* above, exhaustion is excused to avoid a <u>second</u> charge of discrimination.  *See Id*.  *See also Mckenzie v. Illinois Dept. of Transp.*, 92 f.3d 473, 482-83 (7th Cir. 1996).  Therefore, the undersigned finds that Plaintiff has failed to exhaust his administrative remedies regarding his claim

-23-

of discrimination and, thus, summary judgment is appropriate.

    C.    Wrongful Discharge

    Plaintiff also asserts a cause of action for wrongful discharge.  It is well-settled that the United

States, as a sovereign, may not be sued without its consent.  United States v. Sherwood, 312 U.S. 584,

586 (1941).  Plaintiff bears the burden of showing that the United States has waived its immunity for

claims of wrongful discharge.  McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 188

(1936).[9]  Plaintiff does not challenge defendant's motion on this issue.  Because Plaintiff fails to show

a waiver of sovereign immunity, summary judgment is appropriate.

## V.    CONCLUSION

    In light of the above analysis, it is recommended that Defendant's Motion for Summary

Judgment (Document # 31) be granted.


                                    s/Thomas E. Rogers, III
                                    Thomas E. Rogers, III
                                    United States Magistrate Judge

January 29, 2008
Florence, South Carolina

**The parties' attention is directed to the important notice contained on the following page.**

---

    [9]  It appears that plaintiff may not maintain an action in tort for wrongful discharge from
federal employment.  Talbert v. U.S., 932 F.2d 1064, n.1 (4th Cir. 1991).  Plaintiff's sole
remedies are available in the Postal Reorganization Act (PRA) or the Civil Service Reform Act
(CSRA) for wrongful discharge from federal employment. Additionally, to the extent Plaintiff is
asserting a breach of contract claim, this court lacks jurisdiction because plaintiff's exclusive
remedy is the CSRA.  Yokum v. U.S. Postal Service, 877 F.2d 276 (4th Cir. 1989)(Postal
employee's exclusive remedy for adverse employment action is set out in the CSRA and the
district court lacks subject matter jurisdiction); See also Fraginals v. Postmaster General, 265
F.Supp.2d 1309, 1318-22 (S.D. Fla. 2003)(citing authority that postal employees have no breach
of contract claim against employer).

-24-